# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **P.C. and S.C. o/b/o J.C.,** | Civ. No. 2:11-06443 (WJM) |
| Plaintiff, | |
| | **OPINION** |
| v. | |
| **HARDING TOWNSHIP BOARD OF EDUCATION,** | |
| Defendant. | |

**WILLIAM J. MARTINI, U.S.D.J.:**

This is an Individuals With Disabilities Education Act appeal. A New Jersey administrative law judge found that the defendant in this matter, Harding Township Board of Education ("Harding"), offered a "free appropriate public education" to a child named J.C. Harding moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment affirming the administrative law judge's decision. J.C.'s parents, Plaintiffs P.C. and S.C., cross-move for summary judgment reversing the administrative law judge's decision. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court will **GRANT** Harding's motion, and it will **DENY** Plaintiffs' cross-motion.

I.   **BACKGROUND**

J.C. is a child who suffers from autism. J.C. lives in Harding Township, New Jersey. In 2008, J.C.'s parents enrolled J.C. in Nexus Language Builders ("Nexus"), a private learning center that treats children with autism. In 2009, Harding Township recommended that J.C. be placed in a preschool autism program in neighboring Long Hill Township. J.C.'s parents rejected the recommendation, opting instead to keep J.C. at Nexus. In 2010, Harding recommended Long Hill's preschool program. Again, J.C.'s parents chose to keep their son at Nexus.

1

On December 30, 2009, J.C.'s parents brought a due process petition against the Harding Township Board of Education, arguing that the Board should pay for J.C.'s placement at Nexus. The petition was consolidated with two additional petitions filed on May 20, 2010 and September 10, 2010. Subsequently, administrative law judge Jesse Straus (the "ALJ") convened a hearing (the "Hearing") on the petitions. The ALJ ultimately concluded that Long Hill would have provided J.C. with a "free appropriate public education," as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*. Accordingly, the ALJ denied the consolidated petition and concluded that Harding did not have to reimburse J.C.'s parents for J.C.'s instruction at Nexus. *See P.C. & S.C. on behalf of J.C. v. Harding Township Bd. of Educ.*, OAL DKT. NO. EDS 06708-10 and 10266-10 (August 10, 2011) (hereafter the "ALJ Opinion"), Ex. A. to Compl., ECF No. 1-1. The following undisputed facts are taken from Judge Strauss's opinion.

A. Autism Diagnosis and Placement at Nexus

When J.C. was two years old, developmental pediatrician Dr. Shelley Lanzkowsky diagnosed him with pervasive developmental disorder—not otherwise specified (PDD-NOS), a form of autism. ALJ Opinion 3. While Dr. Lanzkowsky recommended a full "ABA" program of 20-25 hours per week, she did not recommend that the ABA program be one-on-one. Tr. 3.
ABA stands for "Applied Behavior Analysis." According to Dr. Carol Fiorile, a Ph.D. in special education who testified on behalf J.C. at the Hearing, ABA is "a science that integrates behaviors, environment, positive reinforcement, and operant conditioning." *Id.* at 25. "One identifies the repertoires that are in a child's current performance, identifies those repertoires that are lacking, and then works toward bridging those two aspects and filling in the blanks." *Id.*
For ABA services, Dr. Lankowsky referred J.C. to Nexus. *Id.* at 3. Nexus is learning center; it is not a school, it does not use certified teachers as instructors, and it does not employ occupational, speech, or physical therapists. *Id.* at 9. S.C. enrolled J.C. for twenty hours per week of ABA services at Nexus. *Id.* at 3-4. J.C. has continued at Nexus to the present day.

B. The Long Hill Program

J.C. lives in Harding Township. While Harding does not have a preschool program targeted for autistic children, neighboring Long Hill Township does have such a program. *Id.* at 4.

The Long Hill preschool program applies the principles of ABA. *Id.* at 39. It contains two components, a "Kids in Transition" ("KIT") component and preschool disabled program for socialization ("SKIP") component. The KIT program provides three hours per day of ABA instruction using different teaching methodologies. *Id.* at 13, 29. Long Hill's KIT program is data-based. *Id.* at 12, 29. Long Hill's SKIP component is "an integrated preschool program in which there is an opportunity to take children from the KIT program when they have the prerequisite skills and participate in small- and large-group instruction in a traditional classroom." *Id.* at 12.

Certified special education teacher Michelle Lawton serves as the Board Certified Behavior Analyst ("BCBA") for Long Hill's program. Lawton testified that she works with the Long Hill program on a part-time basis. *Id.* at 14. The director of student services in Harding Township testified that Lawton's contract allows her to make home visits so she can help parents implement the behavior plans taught in school. *Id.*

Lawton testified that in 2009-2010, the Long Hill KIT program had one certified teacher and three assistants for six students, and that in 2010-2011 the Long Hill KIT program had one certified teacher and three assistants for five students. *Id.*

C. The 2009 IEP

In New Jersey, "each district board of education is responsible for providing a system of free, appropriate special education and related services to students wih disabilities age three through 21." N.J. Admin. Code § 6A:14-1.1(d). Right before J.C. turned three, Harding convened a child study team (the "CST") to evaluate J.C.'s needs. ALJ Opinion at 4. The CST was charged with producing an individualized education plan ("IEP") for J.C. In formulating the IEP, CST members evaluated J.C. on multiple occasions. New Jersey certified speech/language pathologist Barbara Thomas observed J.C. at home and at Nexus, and she discussed J.C. with Nexus's director. *Id.* at 4. School psychologist Dawn Pollack conducted a psychological evaluation of J.C., and she memorialized her findings in an August 2, 2009 report. *Id.* at 6. Also, Lawton observed J.C. at Nexus. *Id.* at 7.

After reviewing various reports, including Dr. Lanzkowsky's November 2008 Pediatric Neurodevelopmental Evaluation, the CST classified J.C. as preschool disabled with a diagnosis of pervasive developmental disorder. *Id.* at 8. The CST decided to recommend the Long Hill program because it was an ABA-based public school program that provided 30 hours of instruction per week in "the least restrictive environment," and because J.C. "needed a program with discrete-

3

trial instruction as well as socialization opportunities with non-disabled peers." *Id.* at 17.

On August 21, 2009, one week before J.C. turned three, *id.* at 36, the CST presented an IEP (the "2009 IEP") to S.C. *Id.* at 8. The 2009 IEP recommended that J.C. be placed in the Long Hill preschool program for five days per week. *Id.* At Long Hill, J.C. would receive ABA instruction, as well as speech/language therapy twice per week. *Id.* at 8. The 2009 IEP did not clarify the circumstances under which J.C. would take part in the SKIP program. *Id.* While the 2009 IEP did not address an extended-school year program that ran for five weeks during the summer, the CST discussed this extended program with S.C. at the meeting. *Id.*

Of particular importance for purposes of the instant case, the 2009 IEP did not contain a statement of goals and objectives. At the Hearing, CST members testified that they did not include goals and objectives in the 2009 IEP because they did not have enough information about J.C. *Id.* at 15. CST members testified that it was their plan to enroll J.C. in the Long Hill program, test J.C. with ABLLS, and then reconvene in 30 days in order to add goals and objectives to the 2009 IEP. *Id.*

CST member Meredith Lynar testified that S.C. refused to accept the 2009 IEP at the August 21, 2009 meeting because S.C. needed time to retain a BCBA consultant and observe the Long Hill program for herself. *Id.* at 17. On September 15, 2009, S.C. observed the Long Hill Program with Lynar. *Id.* At some later point, S.C.'s BCBA consultant, licensed New York state psychologist Dr. Nursel Khaya, observed both the Nexus and Long Hill programs. *Id.* At Long Hill, Dr. Khaya observed a teacher and aides working with students one-on-one, and she noted that data was being collected on a daily basis. 19. But Dr. Khaya was critical of one instance where an aide was not doing enough to motivate a child, and another instance where a child having a tantrum was rewarded. *Id.* at 20-21.

Ultimately, Dr. Khaya determined that three hours of ABA services per day would not be enough for J.C., and that the five week summer program allowed for the possibility of regression. *Id.* at 21. Dr. Khaya believed that Lawton did not spend enough time on-site at Long Hill. *Id.* Based on her findings, Dr. Khaya recommended that J.C. enroll in a 30-hour per week, 12 months per year ABA program with one-on-one instruction; that J.C. receive four to six hours of weekly ABA consultation at home, with two to three hours per week of parent training, and a monthly team meeting with parents. *Id.* Dr. Khaya testified that her recommendation led S.C. to reject the 2009 IEP. *Id.* at 22.

D.  The 2010 IEP

In 2010, the CST again produced an IEP (the "2010 IEP") for J.C. *Id.* at 23. The 2010 IEP recommended that J.C. be placed in the full day KIT program at Long Hill with an opportunity to participate in SKIP and with two thirty-minute speech and language therapy sessions. *Id.* at 23. Unlike the 2009 IEP, the 2010 IEP contained a statement of goals and objectives. 23. These goals and objectives were based on observations of J.C. at Nexus in 2010. *Id.* at 23. S.C. stated that she did not have input into the goals and objectives. *Id.* S.C. did not accept the 2010 IEP.

E.  The Hearing

On December 30, 2009, J.C.'s parents filed a due process petition arguing that Harding should pay for one-on-one instruction at Nexus for 30 hours per week, twelve months per year, and that Harding should also pay for other services, including a ten hour home program every week. Harding's Br. at 1, ECF No. 15-1. After mediation proved unsuccessful, the ALJ convened a hearing that took place on 12 days beginning in 2010 and extending into 2011.

During the course of the hearing, the ALJ heard testimony from eight witnesses. ALJ Opinion at 42. Harding's witnesses included Lawton, who testified that the Long Hill KIT program was appropriate for J.C. because it employed ABA and because it would provide opportunities for J.C. to interact with other verbal students. *Id.* at 13.

J.C.'s witnesses included Carol Fiorile, who holds a Ph.D. in special education with an expertise in ABA. *Id.* at 24. After visiting the Long Hill program for approximately one hour, *id.* at 26, Dr. Fiorile concluded that the program suffers from several flaws. Dr. Fiorile testified that Long Hill did not provide enough daily ABA instruction. *Id.* at 27. Dr. Fiorile was concerned about the overuse of praise statements at Long Hill, as well as the lack of instructional programs and the absence of instruction in peer interactions. *Id.* at 28. Also, Dr. Fiorile criticized the reinforcement techniques used with a particular child, though Dr. Fiorile acknowledged that she lacked familiarity with the child's individualized program. *Id.* at 26. Dr. Fiorile believed that Lawton did not spend enough time at Long Hill. *Id.* at 28. Dr. Fiorile concluded that J.C. would not benefit from the SKIP program because J.C. was easily distracted, and Dr. Fiorile also concluded that J.C. would not gain language in incidental interactions with typical peers. *Id.* at 27. Ultimately, it was Dr. Fiorile's recommendation that J.C. receive 30 hours per week of one-on-one ABA instruction, in addition to home based ABA

5

instruction, parent training, and weekly supervision of the home program. *Id.* at 28.

F.  The ALJ's Opinion

The ALJ decided that Long Hill offered J.C. a "free appropriate public education, "or "FAPE," in 2009 and 2010. The ALJ also decided that the absence of goals and objectives in the 2009 IEP was not actionable under the IDEA.

1.  FAPE

The ALJ concluded that the Long Hill Program, in both 2009-2010 and 2010-2011, would have provided J.C. with "an appropriate, individualized [program] . . . designed to provide J.C. with a meaningful educational benefit." *Id.* With respect to the 2009 IEP, the ALJ noted that the CST relied on Dr. Lanzkowsky's report, which suggested 20-25 hours per week of ABA but did not require that the ABA be one-on-one. *Id.* at 28-29. The ALJ explained:

> Although the program did not provide all of the in-school hours recommended by the parents or the recommended home instruction, the District did offer a full-day program based on the principles of ABA with the addition of other approved programs with on-site speech therapy. Without specifying that the ABA would be one-on-one, the program was in effect one-on-one. The SKIP program was available to J.C., but appropriately not specific as to hours because it depended on progress that J.C. would hopefully make. Although not set forth specifically, in the proposed IEP, the Long Hill program provided for parental services and home visits by its BCBA.

*Id.* at 39.

In concluding that Long Hill would have provided J.C. with FAPE, the ALJ considered and rejected the differing views of J.C.'s witnesses. As an initial matter, the ALJ rejected Plaintiffs' argument that the KIT program would not have provided J.C. with a meaningful educational benefit because the program used different teaching methodologies and not just ABA. The ALJ found that "[t]here was no evidence that J.C.'s progress through the discrete trials of ABA would have been impaired by the addition of the electic use of different methodologies at times during the school day." *Id.* at 29.

Next, in response to criticisms that the IEPs did not explicitly provide for one-on-one services, the ALJ pointed to "credible testimony" that students in Long

6

Hill were receiving one-on-one instruction. *Id.* at 30. The ALJ also noted that because J.C. had not been evaluated with ABLLS, it was unclear whether J.C. needed one-on-one services. *Id.*

Next, the ALJ did not accept Dr. Khaya and Dr. Fiorile's testimony that J.C. needed 30 hours per week of one-on-one instruction. *Id.* at 30. The ALJ concluded that Long Hill's 15 hours per week of one-on-one instruction would be sufficient. *Id.* Here, the ALJ noted that Nexus's director and Dr. Fiorile conceded that J.C. had progressed at Nexus, which provided 17.5 hours per week of ABA instruction and no home-based program. *Id.* at 30-31.

Next, the ALJ did not accept Dr. Khaya and Dr. Fiorile's testimony that J.C. needed ten hours per week of home-based ABA. *Id.* The ALJ noted that Dr. Khaya visited J.C.'s home and "related S.C.'s impressions" that J.C. was an easy child without bad tantrums. *Id.* The ALJ also noted that Dr. Fiorile's recommendation was not based on first-person observations of J.C. at home. *Id.* The ALJ ultimately concluded: "I cannot find that this component [ten hours of home-based ABA] was essential to a successful IEP or that its absence fatally flawed either of the IEPs." *Id.*

Next, the ALJ disagreed with Dr. Khaya and Dr. Fiorile's views that that Lawton did not spend enough time at Long Hill to properly supervise its program. *Id.* The ALJ recognized that a full time presence would be ideal, but he also explained that the law did not require a BCBA to be on-site at all times. *Id.* at 32. The ALJ further noted that in 2009-2010, an aide in the Long Hill program had qualified as an associate BCBA. *Id.* Finally, the ALJ pointed to Lawton's contract, which allowed Lawton to conduct home visits to help parents develop strategies. *Id.*

Next, the ALJ rejected Dr. Khaya and Dr. Fiorile's conclusion that the Long Hill program was "fatally flawed." *Id.* at 29. The ALJ noted that Dr. Khaya and Dr. Fiorile's criticisms were based on "brief anecdotal observations of several students with whose specific programs and profiles they were unfamiliar." *Id.*

Finally, the ALJ rejected Dr. Fiorile's testimony that time at Long Hill that was not devoted to something other than targeted ABA instruction was wasted time for J.C. *Id.* at 31. Specifically, Fiorile testified that J.C. would not gain language from incidental learning in the SKIP program. *Id.* The ALJ credited contrary testimony from speech language pathologist Thomas, who opined that someone with a speech and language disability would benefit from opportunities to interpret body language and get along socially. *Id.* The ALJ further noted that J.C. would only be placed in the SKIP program when he was ready for it. *Id.*

7

### 2. The Absence of Goals and Objectives in the 2009 IEP

The ALJ concluded that the absence of goals and objectives in the 2009 IEP did not "den[y] J.C. the opportunity to receive a meaningful educational benefit." *Id.* "It is evident," he wrote, "that the parties were laboring under the handicap of J.C. turning three just prior to the start of the new school year and when school was not in session." *Id.* The ALJ concluded that the "CST intended to . . . quickly conduct ABLLS testing with J.C., and reconvene the IEP meeting with the advantage of meaningful testing input." *Id.* The ALJ found that the failure to include goals and objectives in the 2009 IEP "did not impede J.C.'s right to FAPE, did not impede the parents' opportunity to participate in the decision-making process, and did not cause a deprivation of educational benefits." *Id.* at 36. The ALJ explained:

> Although the IEP was not completed at the first meeting on August 21 or before the beginning of the 2009-2010 school year, the District demonstrated a good-faith effort to take such steps to professionally complete the IEP as soon into the beginning of the school year as possible—within thirty days of August 21 or merely several days into the new school year. The District or its CST did not "sit on its hands" or do nothing before the start of the school year. The District conducted various evaluations of J.C. in July and commenced a timely IEP process . . . S.C. fully participated in the August 21 meeting, was invited to and did observe the Long Hill program, and was anticipated as a cooperator for the ABLLS process. The CST made S.C. aware of the ABLLS testing plan at the August 21 IEP meeting. J.C.'s parents chose not to present J.C. for the requested ABLLS testing at Long Hill, but instead chose to keep J.C. in his previous Nexus setting.

*Id.* at 36-37.

## II. STANDARD OF REVIEW

The parties in an IDEA case are effectively seeking "a judgment on the administrative agency's record." *D.F. v. Collingswood Pub. Sch.*, 804 F.Supp.2d 250, 254 (D.N.J. 2011) (internal citation and quotation omitted), *aff'd in part, rev'd in part on other grounds*, 694 F.3d 488 (3d Cir. 2012). "Because the IDEA requires a district court to grant a judgment on the record based on its ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of no genuine issues of material fact."

*D.B. and L.B. on behalf of H.B. v. Gloucester Township School District*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010) (internal citation and quotation omitted), *aff'd*, 489 Fed. Appx. 564 (3d Cir. 2012). In reviewing an administrative law judge's ruling in an IDEA case, courts apply a modified *de novo* standard of review. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009) (internal citation and quotation omitted). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

**III. DISCUSSION**

"[T]he Supreme Court has directed that a school district's liability for violations of the IDEA is a two-fold inquiry: (1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010). Here, the ALJ found that Harding offered J.C. FAPE in 2009 and 2010. The ALJ also found that Harding did not comply with the procedures set forth in the IDEA, but the ALJ nevertheless found that Harding's procedural violations did not affect J.C.'s substantive rights. J.C. appeals both determinations.

    1.    Plaintiffs Have Not Established By a Preponderance of the Evidence That the 2009 and 2010 IEPs Failed to Provide J.C. With FAPE.

Plaintiffs dispute the ALJ's finding that Harding offered J.C. FAPE in 2009 and 2010. Giving the ALJ's findings the deference required by the IDEA, the Court cannot accept Plaintiffs' arguments.

Because New Jersey receives education funding from the federal government, it must provide its children with a "free appropriate public education" ("FAPE"). *See Cape Henlopen*, 606 F.3d at 65 (citing 20 U.S.C. §§ 1412(a)(1)(A), 1401(9)). "The FAPE required by the [IDEA] is tailored to the unique needs of the child by means of an 'individualized educational program [("IEP")].'" *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)). The appropriateness of an IEP is a question of fact. *P.P. ex rel. Michael P.*, 585 F.3d at 735. "Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley*,

680 F.3d at 269. When an ALJ finds that an IEP provides for a particular services—even where the IEP does not explicitly reference the particular service—courts may credit the ALJ's finding. *See Rachel G. v. Downingtown Area School Dist.*, No. 9-3512, 2011 WL 2682741, at *8 (E.D. Pa. July 8, 2011).

Plaintiffs dispute the ALJ's finding that Long Hill would have provided J.C. with FAPE in 2009-2010 and 2010-2011. First, they argue that the Long Hill KIT program would not have provided J.C. with a meaningful educational benefit because the program used different teaching methodologies and not just ABA. Second, they argue that the ALJ improperly rejected expert testimony that J.C. needed one-on-one attention. Third, they argue that the Long Hill KIT program would not have allowed J.C. to make "meaningful progress" because the program did not provide enough hours of discrete ABA trials. Fourth, Plaintiffs argue that the IEPs were deficient because they did not include parent training, home programming, or opportunities for community generalization. Fifth, Plaintiffs argue that Long Hill's KIT program was not properly supervised or administered because Lawton only worked part-time. Sixth, Plaintiffs argues that Long Hill's staff "did not properly reinforce good behaviors or respond to disruptive behaviors." Seventh Plaintiffs argue that the SKIP program would not have provided J.C. with a meaningful educational benefit because J.C. "did not have the prerequisite skills to benefit from an inclusion environment."

The ALJ considered each of these arguments and found them wanting. The Court finds that the ALJ's analysis was thorough and well-reasoned. The ALJ heard from eight witnesses; he identified instances in which opinions differed; and he resolved disagreements in a rational manner. Plaintiffs have not satisfied their burden to show by a preponderance of the evidence that the ALJ's findings, which the Court accepts as *prima facie* correct, were mistaken.

2. The ALJ Correctly Found That J.C. Failed To Identify An Actionable Procedural Violation in the 2009 IEP

Plaintiffs argues that J.C.'s substantive rights were adversely affected because the 2009 IEP did not include a statement of goals and objectives, and because the 2009 IEP did not include other information such as the frequency and duration of services J.C. would receive in the Long Hill Program. While Plaintiffs have identified a procedural violation in the 2009 IEP, the ALJ correctly determined that the violation did not affect J.C.'s substantive rights.

"A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010) (citing 20 U.S.C. §

1415(f)(3)(E)). "[T]hough it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights." *Id.*

In *C.H. v. Cape Henlopen School District*, the Third Circuit considered a procedural challenge involving an IEP. 606 F.3d at 68. Cape Henlopen violated the IDEA, when it failed to complete an IEP for C.H. by the first day of school. *See* 20 U.S.C. § 1414(d)(2)(A). Though Cape Henlopen missed the deadline, it had demonstrated a "consistent willingness to evaluate C.H. and to develop an IEP." *Id.* at 69. This willingness to evaluate C.H. and create an IEP manifested itself in the form of a psychological evaluation of C.H. and a late-August IEP meeting with C.H.'s parents. Because of C.H.'s parents' schedule, the meeting was cut short. Both sides agreed to continue the meeting several days after the school year began. *Id.* The second meeting never took place because C.H.'s parents decided to enroll their child in a private school. *Id.* at 63-64. C.H.'s parents subsequently brought suit against Cape Henlopen, arguing that the failure to have an IEP in place on the first day of school violated the IDEA.

The Third Circuit held that Cape Henlopen's failure to provide a final IEP on the first day of school did not violate C.H.'s substantive rights. The Third Circuit explained that "the Hearing Panel reasoned an IEP could have been developed for C.H. within a week of the start of the school year, had C.H. remained in the District and had the Parents continued to cooperate. We will not disrupt that determination in the face of mere supposition." *Id.* at 69. Ultimately, because C.H. never enrolled in the Cape Henlopen school, the Third Circuit lacked the "ability to determine whether the failure to develop an IEP on the first day of classes would have resulted in a lost educational benefit." *Id.*

Like *Cape Henlopen*, this case presents a clear violation of the IDEA: Harding's failure to include a statement of goals and objectives in the 2009 IEP. *See* 20 U.S.C. § 1414(d)(1)(a)(i)(II) (requiring that IEPs include "a statement of measurable annual goals"). But also like *Cape Henlopen*, the ALJ in this case found that the school district was working to complete the IEP by the beginning of school. The ALJ also found that Harding intended to produce an IEP containing goals and objectives shortly after J.C. began the school year. *Id.* at 32. Because J.C.'s parents short-circuited the process, the Court cannot say whether the finalized IEP would have resulted in a "loss of educational opportunity" or would have "caused a deprivation of educational benefits." *Bayonne*, 602 F.3d at 565

11

(citing 20 U.S.C. § 1415(f)(3)(E)).[1]  Plaintiffs have not met their burden to set forth an actionable violation of the IDEA.

Plaintiffs' second argument for a procedural violation also fails.  Here, Plaintiffs argue that the 2009 IEP did not include "the frequency and duration of the services [he would receive], [the] student-to-teacher ratio, the type of speech being delivered, the frequency and duration of inclusion . . . [and the] measurement tools or reporting methods."  Pl.'s Br. at 18-19, 24.  The ALJ determined that the IEP would have provided J.C. with FAPE.  Given the standard of review, the Court must accept the ALJ's finding.  To the extent Plaintiffs have identified instances in which the 2009 IEP was not explicit about the services J.C. would receive in Long Hill's program, Plaintiffs have failed to demonstrate that J.C.'s substantive rights were adversely affected.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** Harding's motion for summary judgment.  The Court will **DENY** Plaintiffs' cross-motion for summary judgment.

/s/ William J. Martini  
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: July 31, 2013**

---

[1] Additionally, given that the CST convened an IEP meeting attended by S.C., given the CST's willingness to allow S.C. and her BCBA consultant to observe the Long Hill program, and given the CST's willingness to hold a second IEP meeting to discuss a finalized IEP, the Court cannot find that J.C.'s parents' participation rights were violated when it came to the 2009 IEP.  Nor can the Court find that J.C.'s parents' participation rights were violated when it came to the 2010 IEP.  Plaintiffs maintain that they had "no input whatsoever into the second IEP," Pls.' Br. at 39, but they acknowledge meeting with the CST to discuss the 2010 IEP, *id.* at 38.  *Cf. Bayonne*, 602 F.3d at 566 (participation rights not violated where parents attended IEP meeting in which they made suggestions, and where a revised IEP was presented to the parents for their approval).  There is no suggestion that Harding was unwilling to consider any suggestions Plaintiffs wanted to offer regarding the 2010 IEP.  Indeed, the record demonstrates that Lawton observed the Long Hill program following the 2010 IEP meeting to assess whether the program would serve J.C.'s needs.  ALJ Opinion at 24.